UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 4:06CR639 CEJ |
| RAYMOND L. CLIFTON, | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a Motion to Suppress Out-of-Court Identification of Defendant, and hearing on the motion to suppress was held on January 22, 2007. Further, on February 13, 2007, the Defendant filed a supplemental brief, and, by this court's order, the Government responded on February 23, 2007. In addition, on March 7, 2007, the Defendant filed a motion to strike, which the undersigned will address by separate memorandum.

**#22–Defendant's Motion to Suppress Out-of-Court Identification of Defendant**

Based upon the evidence adduced at the hearing on the motion to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

On October 11, 2006, the Ozark Federal Savings and Loan in Festus, Missouri, was robbed at gunpoint. On that date, a male individual entered the bank wearing a fisherman's style hat, which the tellers also referred to as a "Gilligan's" hat, blue jeans, tennis shoes, and a long sleeve shirt. After entering the bank, the robber approached teller Linda Murphy, and stood approximately two and a

half to three feet from her across her teller's station. He announced a bank robbery to Murphy, saying that he wasn't kidding, and showed her a shiny silver firearm which appeared to be a revolver. He gave her a brown manila envelope and told her to put all of her large bills into the envelope, and told her not to put any dye packs in with the money. Next, the robber asked for all of Murphy's small bills, including the tens and twenties, and warned her not to push any alarm button. She said that she would not push the buttons. After receiving the smaller bills, the robber proceeded to the teller station next to Murphy where Jennifer Williams was working as a teller. A customer by the name of Kevin George was transacting business with Williams, and the robber shoved George out of the way and told him to get down on the floor of the bank. After doing this, he displayed the weapon to Williams and told her to put all of her bills into the envelope. She complied with the robber's demand and, like Murphy, concentrated on the Defendant's features, build, and clothing so she could later describe them accurately. Along with all of the money she placed in the envelope, she also placed "bait money" into the envelope which are recorded bills from the bank. The robber then asked Williams to empty her second teller drawer, and Williams showed him that there was nothing in the drawer. He then also demanded to see Murphy's second teller drawer, and she, likewise, showed him that it was empty.

While the robber was at the tellers' stations, he noticed that the manager Ann Schanz had picked up the telephone, and immediately shouted at her to put down the phone and to stop using it. Schanz was in her manager's office, and had a clear view of the tellers' stations which Williams and Murphy were using, and also had a view of the front of the building and the front entrance to the bank. She had observed the robber come into the front door, and noticed him because he had on a hat, and is not someone that she knew to be a customer. She watched the robber go to the teller's

station, and when he still had his cap on, her thought was that it was against the bank's rules to wear a hat in the bank. She watched the robber as he shoved a manila envelope at Murphy and Murphy handed it back to him with a large amount of cash stuffed in the envelope. She immediately believed the bank was being robbed, and picked up the phone to call the police. As she did so, the robber yelled at her to hang up the phone, and she complied with the demand. She then observed the robber go to the second teller's station, shove the customer to the ground, and take cash from the second teller. When she believed that the robber had left the bank, she began again to pick up the phone to call the police. As she did so, the robber appeared at her door about two to three feet from her face, pointed a gun at her and said, "I told you to get off the phone. Now, get down on the floor or I'll shoot you." Schanz complied with the demand and laid on the floor until the customer, Kevin George, said that the robber had left and it was okay to get up. As Schanz got up from the floor, she noticed the robber driving out of the parking lot of the bank driving a gold sedan which she believed to be a Pontiac. She could see the license plate on the car, and repeated the plate number several times while asking George to write down the plate number on a yellow post-it note. Schanz then called the police and told them that the bank had been robbed at gunpoint, and gave a description of the robber, the car, and the number of the license plate which was Missouri license plate number 177 TEB.

David Marshak is a lieutenant with the Jefferson County Sheriff's Office. On October 11, 2006, he was on duty as a supervisory road deputy, and was in uniform in a county patrol car in the area of Festus, Missouri. In the afternoon hours, he received multiple radio broadcasts which stated that the Ozark Savings and Loan had just been robbed at gunpoint by a white male wearing a fisherman's cap or fishing cap, and driving a gold sedan bearing Missouri license plate 177 TEB. The

vehicle was believed to be possibly heading south on Highway 67. Because of this, Marshak pulled his vehicle onto Highway 67 and drove in a southerly direction while observing the vehicles on the highway. After driving south for about five minutes, he saw a gold sedan bearing Missouri license plate 177 TEB. He immediately radioed for assistance, and continued to follow the vehicle for about two miles. At this point, he decided that it was necessary for him to attempt to stop the vehicle. Marshak activated his emergency lights while behind the vehicle and the driver pulled to the side of the road. Marshak got out of his vehicle, and walked to the right rear quarter panel of the gold sedan, taking up a position at that point. At the right rear of the vehicle, Marshak observed a fishing hat on the back seat of the car. Marshak then removed his firearm from its holster and placed it at his side. While standing in this position, he motioned for the Defendant to get out of the car, and the Defendant complied with this gesture. Marshak then told the Defendant to come to the rear of his vehicle and to place both hands on the trunk. He asked the person for his identification, and the person identified himself as Raymond Clifton, the Defendant in this case. Marshak asked the Defendant where he was coming from, and the Defendant said he was coming from St. Louis and that he had not made any stops on the way. At this point, other police vehicles arrived at the scene of the stop, and the Defendant asked Marshak what the other police cars were doing at the location. Marshak told the Defendant that he was a suspect in a bank robbery, and the Defendant said, "I'm not saying anything else."

      Because the car was on the side of Highway 67, and in an unsafe place, and also because the vehicle itself was evidence in a crime, Marshak had the vehicle towed to an impound lot which is under contract to Jefferson County so that a full search and inventory of the vehicle could be conducted. During the search of the vehicle, Marshak and other deputies recovered the fishing hat

4

from the rear seat of the vehicle, a manila envelope containing a large amount of cash from the front floor board of the car, and a fully loaded .44 caliber silver revolver from under the driver's seat of the vehicle. In addition, when the Defendant, himself, was searched incident to the arrest, it was discovered that the Defendant had on an extra pair of pants and other extra clothing underneath the clothing which he was wearing.

Immediately after the robber left the bank, Murphy, Miller, and Schanz filled out a hold up description questionnaire. All of the bank employees had been previously trained to carefully observe any robbery suspect, and to note the suspect's facial features, build, height, weight, age, and clothing. Schanz and Miller both described the Defendant as age 48 to 50 years old, six feet or more tall, 240 to 250 pounds, big or round face, no facial hair or hair visible on the head under the cap, broad shoulders, broad chest, and wearing a fishing hat. Murphy described the Defendant as five feet ten inches to six feet tall, two hundred or more pounds, round face, light complexion, wearing a fishing hat, and being about 35-40 years of age. The light in the bank, as testified to by the tellers and Ms. Schanz, was excellent and they observed the Defendant for approximately two minutes time paying close attention to his face and features at all times.

According to the description of the Defendant at his line-up as taken by the police, he is fifty years old, six feet one inch tall, and weighs two hundred thirty-five pounds. He also appears to the undersigned and from the photographs in the line-up to have broad shoulders, a round face, a broad chest, and no hair that can be seen under the fishing cap. On October 13, 2006, a line-up was held at the St. Louis County jail. The Defendant was placed in a line-up with four other white males. All of the participants in the line-up wore the same exact color and style jump suits, white tennis shoes, and fishing hats. Three of the participants wore light colored fishing hats, and two wore darker

colored fishing hats. Of the four other persons in the line-up, three of the persons were within six years of age of the Defendant, three inches in height, and twenty-five pounds in weight. The fourth participant was similar in height and weight to the Defendant, but was twelve years older than the Defendant. One of the individuals in the line-up beside the Defendant, had a large mustache or facial hair. The other individuals in the line-up, including the Defendant, appeared to have "stubble." All of the participants have the same general, large build, and broad chest. Further, a lawyer was present to represent the Defendant at the line-up and to witness the line-up.

As to the witnesses, Schanz, Williams, and Murphy, all viewed the line-up separately. They were told that the individual who robbed the bank may or may not be in the line-up, and they were not required to identify anyone in the line-up. They were asked not to discuss the line-up or the Defendant's physical characteristics among themselves or with anyone else, and they did not do so. When each viewed the line-up separately, they each individually immediately picked the Defendant as the person who robbed them. They stated they did so because of the Defendant's physical characteristics which they described in detail. They stated that they were very certain or one hundred percent certain that the Defendant was the person who robbed them.[1]

**Conclusions of Law**

A.  The Identification Evidence

The Defendant asserts that the identification procedures used by the FBI were unnecessarily suggestive, and possibly tainted the out-of-court identification of the witnesses and may taint the in-

---

[1] An FBI agent testified that the witnesses immediately and definitively identified the Defendant as the person who robbed them stating that they were pretty certain of the identification. All of the witnesses testified unequivocally that they were very positive the Defendant was the robber as soon as they viewed the line-up.

6

court identification. Because the undersigned concludes that the procedures used were not unnecessarily suggestive and, when viewed in the totality of the circumstances, quite fair, the Defendant's motion should be denied. As stated above, all of the individuals in the line-up were of the same general height, weight, and build. All of the individuals wore exactly the same type of clothing, were the same general age, and could be described as having a large build and a broad chest. In addition, all of the individuals viewed the line-up separately, and it was not suggested to them who, if anyone, should be identified. In fact, they were told that it was satisfactory if they identified no one in the line-up.

In order to prevail on this motion, the Defendant must initially show that the identification procedures used were impermissibly suggestive to the extent that they may lead to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293 (1967). The undersigned concludes that while the photographic spreads and line-ups may not have been absolutely perfect, they were nevertheless quite fair. The undersigned further concludes, for the reasons stated above, that the procedures used in the identification process were not impermissibly suggestive. Thus, the Defendant fails to meet the threshold that must be proven before suppression of the identification may be further considered. See Simmons v. United States, 390 U.S. 377 (1968); United States v. Devault, 190 F.3d 926 (8th Cir. 1999) (perfect I.D. procedures are not required only fair ones); United States v. Galati, 230 F.3d 254 (7th Cir. 2000).

Even if the procedures were somewhat suggestive (one of the people in the line-up had a full mustache, and one of the individuals was twelve years older than the Defendant), the undersigned concludes that under the totality of the circumstances, the identifications were reliable. The evidence shows that the witnesses had a very good opportunity to view the perpetrator of the crime for

7

approximately two minutes under excellent lighting conditions, the witnesses observed the perpetrator of the crime extremely carefully as they had been trained, and gave descriptions of the perpetrator that were accurate. Further, the witnesses immediately selected the Defendant from the line-up without hesitation, and gave reasons based on the Defendant's facial features, hair, and build while they were positively selecting him as the perpetrator of the crime. In addition, the witnesses stated they did not base their identification on any facial hair, but rather on the overall facial appearance and build and demeanor of the Defendant. Further, the line-up occurred less than forty-eight hours after the bank robbery. Thus, the undersigned concludes that the evidence shows that there was an independent basis for all three of the identifications, and that under the totality of the circumstances, the identifications were reliable. Further, the ultimate determination of the reliability of identification is almost always a jury question unless there is a "very substantial likelihood" of a mistaken identification. See United States v. Schultz, 698 F.2d 365 (8th Cir. 1983); Neil v. Biggers, 409 U.S. 188 (1972); Manson v. Brathwaite, 432 U.S. 98 (1977). [2]

B. The Arrest of the Defendant and the Search of the Vehicle

Although the legality of the arrest of the Defendant and the search of the vehicle was not challenged by way of motion, the undersigned nevertheless notes that the arrest of the Defendant was based on probable cause, and is therefore lawful, as is the search of the vehicle because it was based on probable cause and because it was a valid inventory search. [3]

---

[2]   All five factors listed in Neil v. Biggers, supra, to consider in determining the reliability of an identification strongly favor a finding of reliability of the identification in the case now at bar.

[3]   The legality of the statement made by the Defendant to Marshak prior to his arrest was also not challenged by the Defendant. Because of this and because the Defendant only identified himself and said that he was coming from St. Louis, the undersigned will not further consider this.

Police officers may arrest a person without a warrant if they have probable cause to believe that the person arrested committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed, and that the defendant committed it. See Illinois v. Gates, supra.

In the case now at bar, the undersigned concludes that there was ample probable cause shown to arrest the Defendant. He was observed driving the vehicle used in the bank robbery within a very short time (less than a half hour) after the bank robbery occurred. He fit the description of the bank robber and significantly, when Lt. Marshak approached the vehicle, he observed through the rear window of the vehicle prior to arresting the Defendant, a fishing hat which fit exactly the description of the hat worn by the robber during the perpetration of the robbery. Thus, based on all of the facts stated above, the undersigned concludes that there was, at the very least, a "fair probability" that the Defendant had committed the armed bank robbery. Therefore, the arrest of the Defendant was lawful. After the Defendant was arrested, he was searched incident to the arrest, and it was discovered that the Defendant had on an extra pair of clothing. The discovery of this extra pair of clothing during the search incident to a lawful arrest, was also lawful. See New York v. Belton, 453 U.S. 454 (1981). In addition, there was ample probable cause to search the Defendant's vehicle once it was stopped. It had recently been used in the commission of a bank robbery, and Lt. Marshak had already observed in plain view at least one item of significant evidence which was inside of the vehicle. Therefore, there was a "fair probability" that evidence of the bank robbery would be found

9

inside the vehicle. That being the case, the vehicle could be searched without a warrant. See Chambers v. Maroney, 399 U.S. 42 (1970): Arkansas v. Sanders, 442 U.S. 753 (1979). Therefore, the arrest of the Defendant and the seizure of the hat, the cash money, and the firearm was lawful.

## Conclusion

Therefore, the Defendant's motion should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Out-of-Court Identification of Defendant (Doc. #22) be denied.

Further, as to the motion to suppress, the parties are advised that they have until April 20, 2007, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990

      /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of April, 2007.